IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

MARK LANGENFELD,              )
                             )
              Plaintiff,      )
                             )
vs.                          )              No. 05-CV-619-TCK-SAJ
                             )
                             )
CHASE BANK USA, N.A., et al., )
                             )
              Defendants.     )

<u>OPINION AND ORDER</u>

Before the Court are the following motions for summary judgments:  Defendant Frederick

J. Hanna & Associates, Inc.'s Motion for Summary Judgment (Doc. 219); Defendant Chase Bank

USA, N.A.'s Motion for Summary Judgment (Doc. 220); Defendant Citibank (South Dakota),

N.A.'s Motion for Summary Judgment (Doc. 221); and Defendants MBNA America Bank, N.A. and

Bank of America, N.A.'s Motion for Summary Judgment (Doc. 222).  Also before the Court are the

following procedural motions: MBNA America Bank, N.A. and Bank of America, N.A.'s Motion

to Strike Plaintiff's Surreply (Doc. 268); Plaintiff's Motion to Overrule Motion to Strike (Doc. 269);

and Plaintiff's Motion for Hearing (Doc. 271).

I.      **Factual Background**

        A.      <u>Parties and Claims</u>

        Plaintiff is a fifty-two year old man with a college education who has worked primarily in

the field of systems automation.  From 1998 to 2003, Plaintiff opened numerous credit card accounts

and incurred debt thereon.  On September 27, 2005, Plaintiff filed suit against several Defendants,

consisting of creditors and collection agencies, alleging violations of the Truth in Lending Act, 15

U.S.C. § 1601, *et seq*. ("TILA") and the Oklahoma Uniform Consumer Credit Code, Okla. Stat. tit.

14A, § 1-101, *et seq.* ("OUCC").   In his Second Amended Complaint, Plaintiff alleges that Defendants failed to properly respond to billing error notices and/or wrongfully attempted to collect disputed amounts owed, resulting in numerous violations of TILA and the OUCC.   As a result of such violations, Plaintiff seeks several forms of relief:   (1) reducing debt owed "by the statutory forfeiture of $50" pursuant to 15 U.S.C. § 1666(e);   (2) statutory damages of $1000 for each violation of Oklahoma and federal law;[1] (3) costs and attorneys' fees; and (4) an injunction requiring Defendants to notify any relevant entities that he is not delinquent on any account and to refrain from reporting him to further collection agencies.   (Second Am. Compl. ¶¶ 9-10.) Plaintiff was originally represented by counsel but is now appearing pro se.

There are five remaining Defendants, four of which are creditors of Plaintiff ("Creditor Defendants"): Chase; Citibank (South Dakota), N.A. ("Citibank"); Bank of America, N.A. ("Bank of America"); and MBNA America Bank, N.A. ("MBNA").[2]   The other remaining Defendant is Frederick J. Hanna & Associates, Inc. ("Hanna"), a law firm that attempted to collect debt from Plaintiff on behalf of Defendant Bank of America.   Defendant Chase asserted a counterclaim to recover Plaintiff's unpaid debt in the total amount of $22,810.02.   Defendant Bank of America asserted a counterclaim to recover Plaintiff's unpaid debt in the amount of $12,244.03.[3] During the pendency of this case, Plaintiff filed a Chapter 13 bankruptcy proceeding in the United States

---

[1]   For example, Plaintiff seeks $687,000 from Defendant Chase Bank USA, N.A. ("Chase"), resulting from 687 alleged TILA violations. (*See* Plaintiff's Computation of Damages as to Defendant Chase, Ex. T to Chase's Mot. for Summ. J.)

[2]   Bank of America and MBNA are now known collectively as FIA Card Services, Inc. ("FIA"), and FIA filed one motion for summary judgment on behalf of MBNA and Bank of America.

[3]   Citibank originally asserted a counterclaim but later withdrew such claim because it sold Plaintiff's account to a third party.   MBNA and Hanna have not asserted counterclaims.

Bankruptcy Court for the Eastern District of Virginia, Case Number 07-31158 ("Bankruptcy Proceeding").  On May 1, 2007, the Court stayed all counterclaims asserted against Plaintiff due to the automatic stay in the Bankruptcy Proceeding.  Pursuant to a Notice of Relief from Automatic Stay filed by Chase (Doc. 245), the Court lifted the stay as to Chase's counterclaim against Plaintiff. Bank of America's counterclaim remains stayed.

B.      Credit Card Accounts

Plaintiff opened two separate accounts with Chase, one in 1992 ("92 Chase Account") and one in 1998 ("98 Chase Account").  Plaintiff regularly used the Chase accounts and made payments thereon until January of 2005.  The balance owed on the 92 Chase Account is $12,901.23, and the balance owed on the 98 Chase Account is $9,908.79, for a total of $22,810.02.  In 1998, Plaintiff opened an account with Citibank, regularly used the account, and made payments thereon until January of 2005.  The balance owed on the CitiBank account is $23,005.42.  In 2000, Plaintiff opened an account with MBNA, regularly used the account, and made payments thereon until January 2005.  The balance owed on the MBNA account is $16,968.60.  In 2003, Plaintiff opened an account with Bank of America, regularly used the account, and made payments thereon until December of 2004.  The balance owed on the Bank of America account is $18,274.11.  Collectively, Plaintiff has outstanding balances on his accounts with Creditor Defendants totaling approximately $81,058.15

C.      DRSM and the DRSM TILA Compliance Program

At times relevant to this lawsuit, there existed a company known as Debt Relief Services

3

Marketing ("DRSM").[4]  Beginning on or around October 2004, DRSM began marketing a program

known as the DRSM TILA Compliance Program (the "Program").   (*See* Ex. E (questions and

answers regarding Program), Ex. F (sample "welcome" letter and explanation of Program), & Ex.

G (sample "to do" list and disclaimers regarding Program) to Chase's Mot. for Summ. J.)   The

DRSM materials in the record before the Court describe the Program as follows:

> Overview.  Unlike other credit card dispute systems, the TILA Credit Card
> Compliance program is not 'debt elimination.'  The validity of the underlying debt
> is not being challenged on the usual theories being circulated on the Internet.  Our
> goal is to assist DRS clients in monitoring bank compliance with consumer
> protection laws and regulations, particularly the Truth in Lending Act.
> Bank's Failure to Disclose.  Banks routinely violate these laws and regulations.  In
> particular, we have found that most, if not all, credit card banks fail to make all
> disclosures required by the Truth in Lending Act. . . . DRS will assist you in drafting
> a proper billing error Dispute Letter and in gathering your documentary evidence that
> the indebtedness is incorrect because of the bank's failure to give required
> disclosures.  These letters will dispute the accuracy of a number of items on your
> statements.
> . . .
> Disputing the Banks. . . . We have found that the vast majority of creditors (banks)
> will fail to meet their obligations and will violate your consumer rights in a number
> of ways . . . .
> . . .
> Suing the Bank.  If (more likely, when) the banks violate your rights, as they have
> consistently done to so many consumers in the past, DRS will assist you in finding
> an attorney to file your case.  In speaking to dozens of attorneys so far, the DRS legal
> staff has not encountered a single attorney who did not express a keen interest in
> taking all of these cases we could refer to them.

(Ex. F to Chase's Mot. for Summ. J.)  In addition to these explanations, there are also "questions and

answers" published by DRSM that are helpful in understanding the Program:

> . . .
> Q: Exactly how does the TILA process work, step by step, from beginning to end?
> A: First, we review your accounts to see if they can be disputed.  So far, we have not

---

[4]     DRSM is currently operating as Consumer Financial Educators.  For purposes of this
Order, the Court refers to this entity as DRSM.

found any that cannot.  Then, we provide you with dispute letters to send to your banks instead of your payment.  Once the bank gets the dispute letters, the law imposes certain requirements on them.  You will keep track of the calls, letters, and statements you get from the banks.  Your DRSM TILA Compliance Specialist will assist you in determining all possible violations of the law by the banks, and there should be many.  Once the banks report you as sixty days late, you will sue them in federal court for their violations of TILA.

Q: Could the banks claim entrapment?  Is this just a strategy to trick the banks into committing violations?

A: No.  The banks invariably have committed violations even before you dispute the account.  The way they choose to respond to the dispute compounds their violations.

. . .

Q: How do collection calls and letters contribute to the recovery?

A: Each time the bank or one of its debt collectors sends you a statement or a collection letter or makes a collection call, there is usually at least one violation.  The more they call or write you, the more violations, and the more damage awards you're entitled to.  Just be sure to keep your log of all communications you receive from the bank and forward it to us according to our instructions.

Q: How will I know what to say when the bank calls?

A: We will give you a simple script to follow.  Don't worry.  You won't have to say much.  The bank usually makes at least one violation just by calling.  If you ask one simple question we provide you, they usually make another violation.  Then you can say goodbye, log the call, and look forward to their next call.

. . .

Q: Will I need an attorney for this process?

A: Yes, and we have a growing network of attorneys who are very willing to take these types of cases on contingency, which means no recovery equals no fee, so there is no retainer.

. . .

Q: Why is there a 5% deferred fee to DRSM in addition to the up front fee?

A: The TILA approach involves much more work for DRSM.  To keep the front end fees affordable to you, we defer 5% until you have received damages.

(Ex. E to Chase's Mot. for Summ. J.)

The Program was created by an attorney named Agostino V. Coccia ("Coccia") and a paralegal named Gerald Collette ("Collette").  (*See* Collette Dep., Ex. C to Chase's Mot. for Summ. J., at 165-66.)  Before they began marketing the Program, Coccia "went around to certain key areas, particularly where there were a lot of DRS clients, like California, Texas, Oregon, and lined up attorneys who were willing to take these cases."  (*Id.* 165:7-11.)  According to Collette, Coccia

believed they would not have trouble finding attorneys for DRSM clients because the Program was "so supported by case law." (*Id.* 165:5.)  According to Coccia, his original intent was that he and Collette would train customer service representatives to identify TILA violations in the paperwork provided by potential clients.  Representatives would then "audit the paperwork of the account for violations" and "review the statements to identify billing errors." (Coccia Dep., Ex. D to Chase's Mot. for Summ. J., at 449:18-450:17.)[5]  What actually happened was different:

> Q: And none of that ever happened, or some of that happened?
> A: I think generally *they* asked – *they* started asking clients and none of them – very few of them even had the documents or couldn't complete the questionnaire in regards to when certain documents were received in comparison to when the card was received or when the first transaction was made, things of that nature.  So I think that's why they decided to just send the *general letter* out for everybody, because it could still trigger the Act regardless of that information.
> Q: So the goal was to somehow trigger the act?
> A: I believe so.

(*Id.* 450:18-451:8) (emphasis added).[6]  The "general letter" referred to by Coccia purports to identify "billing errors" on the clients' statements that are caused by creditors' failures to comply with TILA's disclosure requirements upon the clients' opening of their accounts.[7]  Collette testified that

---

[5]    The Collette and Coccia depositions were taken in 2006 in a case filed by Chase Bank in North Carolina state court against several entities, including Debt Relief Services, which appears to be the same entity or a related entity to DRSM.  (*See* Exs. C and D to Chase's Mot. for Summ. J.)

[6]    Coccia and Collette were in some type of consulting role but were not DRSM owners or managers, which explains Coccia's use of the word "they" in this response. (See *id.* 500:18-24.)  Nonetheless, it is undisputed that Coccia and Collette were instrumental in developing the Program and drafting the billing error notices ultimately sent by Plaintiff to Creditor Defendants in this case.

[7]    As explained in more detail below, these general letters provided by DRSM are the subject of least three published federal decisions.  *See Eicken v. USAA Fed. Savings Bank*, 498 F. Supp. 2d 954 (S.D. Tex. July 26, 2007); *Cunningham v. Bank One*, 487 F. Supp. 2d 1189 (W.D. Wash. March 12, 2007); *Esquibel v. Chase Manhattan Bank US, N.A.*, 487 F. Supp. 2d 818 (S.D. Tex. March 9, 2007).  In the *Eicken* decision, the court specified that the plaintiff purchased the

he and Coccia had a "good faith" reason to believe that no consumer who purchased the Program had received the proper disclosures from their respective creditotrs.  Such belief was based on research completed by Coccia that revealed that "all the big banks we were dealing with were failing to make the proper disclosures."  (Collette Dep. 177:21-179:20.)

       D.     <u>Plaintiff's Purchase and Use of the Program</u>

By conducting Internet research, Plaintiff learned of DRSM and the Program.  Sometime around January 2005, Plaintiff purchased the Program.[8]  He began communicating with a DRSM employee, Maggie Hill ("Hill"), whose job title was TILA Compliance Specialist.  On January 27, 2005, Hill sent Plaintiff an email entitled "instructions for Initial TILA Dispute Letter," wherein Hill provided Plaintiff with a dispute letter for each of his credit card accounts and gave Plaintiff specific instructions for sending such letters to Creditor Defendants in this case.  (*See* Ex. H to Chase's Mot. for Summ. J.)  In January and February of 2005, Plaintiff sent identical "First Notice of Billing Errors" to all Creditor Defendants ("Notices").  (*See, e.g.*, Exs. I and J to Chase's Mot. for Summ. J.; Ex. 5 to FIA's Mot. for Summ. J.; Ex. 2 to Citibank's Mot. for Summ. J.)  The Notices were identical to the form letters sent by Hill, except that Plaintiff filled in the certified mail numbers, dates, and his signature.[9]  Creditor Defendants sent various responses to the Notices.  (*See, e.g.*, Ex. K to Chase's Mot. for Summ. J.)  Thereafter, consistent with the DRSM model and the instructions received from Hill, Plaintiff sent to Creditor Defendants several additional letters informing them

---

letters from a company known as Debt Relief Services.  *Eicken*, 498 F. Supp. 2d at 959.  In the other two decisions, the courts did not explain where the plaintiff received the letters.

    [8]    Plaintiff does not recall the exact amount he paid for the Program but it was in excess of one thousand dollars.  (Langenfeld Dep., Ex A to FIA's Mot. for Summ. J., at 139:14-17.)

    [9]    The content of the Notices is set forth in detail below.

that they had not corrected the error, performed an adequate investigation, or sent the requested documentation.  (*See, e.g.*, Ex. R ("Second Notice of Billing Errors" dated March 2, 2005) & Ex. M ("Response to Alleged Compliance with my Notice of Billing Error" dated March 14, 2005) to Chase's Mot. for Summ. J.)  Such letters were also form letters provided to Plaintiff by Hill.

     E.    <u>Plaintiff's Filing of this Lawsuit and the Bankruptcy Proceeding</u>

After sending several Notices and having numerous telephone communications with each of the Creditor Defendants, Plaintiff, represented by counsel, filed suit in Tulsa County District Court on September 27, 2005.  Defendants removed the case to this Court on October 31, 2005.  On July 5, 2006, counsel for Plaintiff filed a motion to withdraw based on a conflict of interest, which the Court granted.  (Doc. 136.)  The Court then stayed the case and allowed Plaintiff a significant amount of time to find substitute counsel. (Docs. 136, 165.)  Plaintiff was unable to do so, and Plaintiff elected to proceed pro se.  After conducting a hearing attended by Plaintiff, the Court entered a schedule governing the remainder of the case. (Docs. 175, 177.)  On May 11, 2007, after agreeing to a schedule, participating in discovery, and refusing to attend a settlement conference, Plaintiff moved to voluntarily dismiss his claims.  This motion coincided with his filing of the Bankruptcy Proceeding.  For reasons set forth in an Opinion and Order dated July 10, 2007 (Doc. 250), the Court denied Plaintiff's motion and ordered him to respond to the pending motions for summary judgment.[10]  Plaintiff filed his responses, as well as surreply briefs, which have been fully

---

[10]    Now that the Court is more familiar with the impetus for Plaintiff's suit, the Court is further convinced that denial of this motion was proper.  The DRSM model encourages the filing of lawsuits as a means to recover damages sufficient to eliminate debt.  Individuals following this model should be aware that a lawsuit is a serious matter.  It results in the expenditure of time and money by the parties sued, as well as the expenditure of judicial resources.  It is unfortunate for Plaintiff that he was abandoned by counsel and apparently by DRSM, but that does not change the prejudice resulting from dismissal of a lawsuit at late stages of the proceedings.

considered by the Court in ruling on the present motions.[11]

## II.   Creditor Defendants' Motions for Summary Judgment on FCBA Claims

### A.   Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### B.   TILA/FCBA Statutory Framework and Creditor Defendants' Arguments

TILA is "remedial legislation designed to prevent predatory creditor practices." *James v. Ford Motor Credit Co.*, 638 F.2d 147, 149 (10th Cir. 1980); *see also Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1040 (6th Cir.1984) (stating that TILA is intended "to protect the consumer from divergent and at times fraudulent practices stemming from the uninformed use of credit"). Plaintiff alleges violations of a specific part of TILA known as the Fair Credit Billing Act ("FCBA"), 15 U.S.C. § 1666, *et seq.* The FCBA imposes certain obligations on creditors who extend "consumer credit," which means the "transaction is one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are

---

[11] Defendants MBNA and Bank of America's Motion to Strike Plaintiff's Surreply (Doc. 268) is denied, and Plaintiff's Motion to Overrule FIA's Motion to Strike (Doc. 269) is granted.

primarily for personal, family, household, or agricultural purposes." 15 U.S.C. § 1602(h); *see also*

*Am. Express Co. v. Koerner*, 452 U.S. 233, 240-46 (1981) (concluding that FCBA requirements do

not apply if credit was extended to corporation).[12]  Relevant to this case, the FCBA sets forth a

dispute resolution procedure for the "correction of billing errors" on consumer credit statements.

*See* 15 U.S.C. § 1666(a); 12 C.F.R. § 226.1 (stating that one purpose of FCBA is to "provide a

means for fair and timely resolution of credit billing disputes"); *Gray v. Am. Express Co.*, 743 F.2d

10, 13 (D.C. Cir. 1984) ("Fair Credit Billing Act seeks to prescribe an orderly procedure for

identifying and resolving disputes between a cardholder and a card issuer as to the amount due at

any given time.").

Section 1666(a) provides the procedural framework governing correction of billing errors

on consumer credit statements.  It imposes specific requirements for the "time and contents" of the

notice of billing error provided by the obligor, as well as the procedure to be followed by creditors

upon receipt thereof:

> (a) Written notice by obligor to creditor; *time for and contents of notice*; procedure
> upon receipt of notice by creditor
>
> If a creditor, *within sixty days after having transmitted to an obligor a statement of
> the obligor's account* in connection with an extension of consumer credit, receives
> . . . a written notice . . . from the obligor in which the obligor–
>> (1) *sets forth or otherwise enables the creditor to identify the name and
>> account number (if any) of the obligor*,
>> (2) *indicates the obligor's belief that the statement contains a billing error
>> and the amount of such billing error*, and
>> (3) *sets forth the reasons for the obligor's belief (to the extent applicable)
>> that the statement contains a billing error*,
> the creditor shall [follow specific procedures regarding the obligor's account.]

---

[12]    In this case, it is undisputed that all accounts qualify as extensions of "consumer"
credit.

10

15 U.S.C. §1666(a) (emphases added to "timeliness" and "content" requirements imposed upon obligor).  Section 1666(b) defines "billing error," which is used in § 1666(a)(2) and (3), as "any of the following" seven items:

> (1) *A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.*
> (2) *A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.*
> (3) A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction.
> (4) The creditor's failure to reflect properly on a statement a payment made by the obligor or a credit issued to the obligor.
> (5) *A computation error or similar error of an accounting nature of the creditor on a statement.*
> (6) Failure to transmit the statement required under section 1637(b) of this title to the last address of the obligor which has been disclosed to the creditor, unless that address was furnished less than twenty days before the end of the billing cycle for which the statement is required.
> (7) Any other error described in regulations of the Board.

*Id.* § 1666(b) (emphases added to three types of "billing errors" alleged by Plaintiff in this case). Thus, an obligor must comply with § 1666(a)(1)-(3) by:  (1) providing identifying information of his name and account number; (2) indicating his belief that his statement contains one or more of the seven types of "billing errors" set forth in § 1666(b) and the amount(s) thereof; and (3) to the extent applicable, setting forth the reasons for such belief (collectively "Content Requirement"). *See id.* § 1666(a)(1)-(3).  An obligor must do so within sixty days of the creditor's transmission of the allegedly erroneous statement ("Timeliness Requirement").  15 U.S.C. § 1666(a).

If the written notice provided by the obligor satisfies the Content Requirement and Timeliness Requirement, then a creditor must follow the procedures outlined in § 1666(a)(A) and (B), which include, *inter alia*, a written correction of the billing error or explanation of why the billing error was not corrected ("Compliance Duties").  If the written notice provided by the obligor

11

does not satisfy both the Content Requirement and the Timeliness Requirement, the creditor's Compliance Duties are not triggered. *See Burnstein v. Saks Fifth Ave. & Co.*, 208 F. Supp. 2d 765, 772 (E.D. Mich. 2002) ("In order for these procedures [Compliance Duties] to be triggered, however, the consumer must provide the requisite written notice of a billing error.") (addressing whether content of notice was sufficient to trigger Compliance Duties); *see also Dawkins v. Sears, Roebuck, & Co.*, 109 F.3d 241, 243 (5th Cir, 1997) (holding that an obligor who did not satisfy the Timeliness Requirement "failed to trigger [the creditor's] obligations under § 1666(a)") (addressing whether notice was timely).  If an obligor satisfies the Content Requirement and the Timeliness Requirement and the creditor fails to comply with its Compliance Duties, the obligor may pursue a private right of action for a TILA violation pursuant to 15 U.S.C. § 1640.  Such cause of action must be brought within one year from the date of the occurrence of the violation ("Statute of Limitations").  *Id.* § 1640(e).

Creditor Defendants' principal arguments in support of summary judgment are that their Compliance Duties never arose in light of Plaintiff's failure to trigger such duties. *Cf. Burnstein*, 208 F. Supp. 2d at 773 (defendant contended "its duties never arose, in light of [p]laintiff's purported failure to trigger [defendant's] statutory responsibilities by giving adequate notice of any alleged billing errors"); *Belmont v. Assocs. Nat'l Bank*, 119 F. Supp. 2d 149, 157 (E.D.N.Y. 2000) (defendant contended letter was not a billing error notice and "did not trigger" the defendant's Compliance Duties).  These arguments relate to Plaintiff's failures to satisfy the Content Requirement and the Timeliness Requirement, although the arguments take several forms.  All Creditor Defendants argue that, assuming the alleged "billing errors" are TILA disclosure violations, disclosure violations do not qualify as "billing errors" and therefore Plaintiff cannot satisfy the

12

Content Requirement.[13]  Chase and FIA further argue that, assuming the alleged "billing errors" are improper finance charges, such charges do not qualify as "billing errors" and therefore Plaintiff cannot satisfy the Content Requirement.  Chase also contends that Plaintiff cannot satisfy the Content Requirement because his Notices were sent in bad faith.  Chase and Citibank argue that, even if Plaintiff can satisfy the Content Requirement, he cannot satisfy the Timeliness Requirement.  All Defendants argue that, even if Plaintiff can satisfy the Content and Timeliness Requirements, Plaintiff's claims are barred by the Statute of Limitations.  Because there is little published or circuit law in this area, the Court will address all principal arguments raised by Creditor Defendants.

      C.     Content Requirement - "Billing Error"

Creditor Defendants argue, and Plaintiff concedes, that the error alleged in an obligor's written notice meet the statutory definition of "billing error" contained in 15 U.S.C. § 1666(b) in order to satisfy the Content Requirement and trigger a creditor's Compliance Duties.  (*See* Pl.'s Resp. to Chase's Mot. for Summ. J. 12 (admitting that "[t]he error asserted must be a 'billing error' as defined in § 1666(b) and 12 C.F.R. § 226.13(a)" but arguing that "the types of potential 'billing errors' are nearly unlimited").  In addition to the agreement of the parties, this requirement is supported by case law.  *See Esquibel v. Chase Manhattan Bank USA, N.A.*, 487 F. Supp. 2d 818, 827 (S.D. Tex. 2007) ("The written notice must point out some perceived problem with a statement that meets the statutory definition of billing error."); *Belmont*, 119 F. Supp. 2d at 157 (analyzing whether an alleged "wrong person error" met statutory definition of "billing error" for purposes of determining if notices were sufficient to trigger Compliance Duties); *Greisz v. Household Bank*, 8

---

[13]  As explained below, the Court construes Plaintiff's alleged error to be erroneous finance charges.  Therefore, Creditor Defendants' arguments regarding whether "disclosure violations" qualify as  "billing errors" are not addressed.

F. Supp. 2d 1031, 1042 (N.D. Ill. 1998) (holding that consumer's notice was insufficient to trigger Compliance Duties because the dispute alleged by the consumer regarding the quality of an accepted good or service did not meet the definition of "billing error" contained in § 1666(b)); *Thomas v. Discover Fin. Svcs.*, No. 06-A-1122, 2007 WL 2746846, at * 4 (N.D. Ill. Sept. 13, 2007) (granting motion to dismiss because alleged errors did not qualify as "billing errors"). *Cf.* 15 U.S.C. § 1666(c) ("Nothing in this section shall be construed to prohibit any action by a creditor to collect any amount *which has not been indicated by the obligor to contain a billing error*.") (emphasis added). Accordingly, the Court concludes that, in order to trigger Compliance Duties, the perceived problem identified in the notice must satisfy the statutory definition of "billing error."[14]

### 1.   *Identification of Alleged Errors*

The Court must identify the errors about which Plaintiff was providing notice before it can determine whether they satisfy the statutory definition of "billing error."  Creditor Defendants seek to classify the errors as "disclosure violations," meaning the creditors' failures to provide certain disclosures at the inception of the account.  (*See, e.g.*, Chase's Mot. for Summ. J. Part III.A.1-3.) Plaintiff seeks to classify the error as wrongfully imposed finance charges.  Specifically, Plaintiff testified that "the finance charges charged from the inception of the account are the errors."

---

[14]    It is true that § 1666(b)(2) provides that a notice must "indicate[] the obligor's *belief* that the statement contains a billing error and the amount of such billing error" (emphasis added).  However, the "belief" language in § 1666(a)(2) merely indicates that a plaintiff need not be ultimately correct in his assertion of error in order to trigger the creditor's Compliance Duties. *See Belmont*, 119 F. Supp. 2d at 159 n.6 ("Section 1666's requirements that a creditor promptly respond to consumer inquiries is triggered upon receipt of a timely notice of 'billing error' regardless of whether the consumer who sent the notice was correct in his belief that an error has been made.").  Nonetheless, as has been held or implied by every court addressing the question, the *perceived* error identified in the notice must qualify as a "billing error," as defined in § 1666(b).

(Langenfeld Dep. 224:4-7; s*ee also* Pl.'s Resp. to Chase's Mot. for Summ. J. 16 ("The failure to properly disclose was only the *reason* for the notice; it was not the subject of the dispute.  The finance charge was the subject of the dispute.")  Coccia, who provided legal consulting regarding the DRSM form letters, testified that "[t]he billing error is the finance charge." (Coccia Dep. 351:3.)

The Notices themselves are lengthy, and it is difficult to identify what constitutes the alleged error.  In an introductory paragraph, the Notices provide:

> Pursuant to 15 U.S.C. § 1666, I am writing . . . within sixty days of receiving a statement of my account dated 1/25/2005 in connection with extensions of consumer credit.  I hereby provide you with notice that I believe said statement contains errors in the total amount you allege to be due, and other more specific items, as laid out more completely below.  *My belief that that statement contains billing errors under 15 U.S.C. § 1666(b)(1), (2), and (5) is based upon my belief that you failed to give all the proper disclosures required by law to me prior to opening this account, and additional disclosures since then.  Because you failed to provide these disclosures, the account could not legally be opened and I should not be responsible for the payment of interests, fees or other finance charges.*  While I understand I will likely still be responsible for the repayment of purchases and cash advances, *I do not believe I should be responsible for interest, finance charges and other fees.*  As I have made payments on this account that have been applied to these improper charges the items I am claiming are billing errors are improperly reflected on the statements in the incorrect amount and/or inaccurate due to a computational or accounting error.

(*See, e.g.*, Ex. I to Chase's Mot. for Summ. J (emphasis added).)  In the first subsection of the Notices, which references 15 U.S.C. § 1666(b)(1) and (5), Plaintiff specifies which items on the statement are disputed:  "I dispute the accuracy of the following items on my statements which have been calculated based on the inclusion of those charges: the current balance, the amounts and payments due and all finance charges and other fees charged since the account was opened."  (*Id.*)  In the second subsection, which references 15 U.S.C. § 1666(b)(2), Plaintiff requests copies of eight specific categories of documents, including "[c]opies of documents showing that all disclosures required by law that were given to me prior to opening this account" and "[t]he original cardholder

agreement to which you allege I first agreed to, as well as any amendments made thereto."  (*Id.*)

Based on the language of the Notices and the testimony in the record, and viewing the evidence in the light most favorable to Plaintiff, the Court concludes as follows: (1) the alleged errors on the challenged statements are improper finance charges; and (2) the alleged *reasons* that the finance charges are erroneous are the creditors' failures to provide proper disclosures at the inception of the accounts.  These conclusions are supported by at least one case addressing identical notices.  *See Esquibel,* 487 F. Supp. 2d at 828 (rejecting defendant's argument that "disclosure violations" were the errors alleged in plaintiff's notices).  *But see Thomas*, 2007 WL 2746846, at * 4 (determining, without explanation, that "disclosure violations" were errors alleged in plaintiff's notices).

> 2.   *Analysis of Whether Allegedly Erroneous Finance Charges Qualify as "Billing Errors"*

The limited number of district court decisions are split as to whether erroneously imposed finance charges, as alleged in Notices identical to those at issue in this case, qualify as "billing errors" pursuant to 16 U.S.C. § 1666(b).  *Compare Raney v. First Nat'l Bank of Neb., Inc.*, No. 06-8-DLB, 2006 WL 2588105, at * 3 (E.D. Ky. Sept. 8, 2006) (holding, for purposes of a motion to dismiss, that "allegedly improper finance charges may qualify as billing errors for purposes of § 1666(b)" because "nothing in § 1666(b) indicates that the scope of the provision was not meant to apply to finance charges" and because "the language of the statute requires only that a claimant allege a dispute of a billing error in connection with 'an extension of credit.' (i.e., a credit card)"), *and Eicken v. USAA Federal Sav. Bank*, No. H-05-4139, 2006 WL 1663371, at * 2 (S.D. Tex. June 12, 2006) (holding, for purposes of a motion to dismiss, that "the statute obviously contemplates the inclusion of [finance] charges within [the § 1666(b)] definitions" because the subsequent section,

16

15 U.S.C. § 1666(c), mentions that statements of account "'may include finance charges or [sic] amounts in dispute'"),[15] *with Esquibel v. Chase Manhattan Bank USA, N.A.*, 487 F. Supp. 2d 818, 828 (S.D. Tex. 2007) (holding that finance charges do not qualify as billing errors because they are not "extensions of credit" but instead are merely *incident to* extensions of credit and therefore do not meet statutory definitions in § 1666(b)(1) or (2) and further holding that erroneous finance charges do not qualify as computation errors under § 1666(b)(5)), *and Cunningham v. Bank One*, 487 F. Supp. 2d 1189, 1191-93 (W.D. Wash. 2007) (rejecting plaintiff's argument that "finance charges are an extension of credit under 1666(b)(2)" without significant explanation).  There are no circuit decisions on this question. The Court will analyze whether the alleged erroneous finance charges qualify as "billing errors" pursuant to § 1666(b)(1), (2), or (5).

a.    15 U.S.C. § 1666(b)(1) or (2)

Before analyzing whether allegedly erroneous finance charges qualify as "billing errors" pursuant to 15 U.S.C. § 1666(b)(1) or (2), this Court finds it necessary to address a threshold question of statutory construction within these provisions.  Specifically, it is unclear whether the phrase "of an extension of credit," modifies the word "reflection" ("First Interpretation") or modifies the word "statement" ("Second Interpretation").  For ease of reference, the Court sets forth these provisions again:

> For the purpose of this section, a "billing error" consists of any of the following:
> (1) A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected

---

[15]     The *Eicken* court misquoted 15 U.S.C. § 1666(c), which actually provides that statements of account "may include finance charges *on* amounts in dispute."  15 U.S.C. § 1666(c) (emphasis added); *see also Esquibel v. Chase Manhattan Bank USA, N.A.*, 487 F. Supp. 2d 818, 828 n. 53 (S.D. Tex. 2007) (explaining disagreement with *Eicken*'s reasoning and pointing out that court in *Eicken* misquoted statute).

        on such statement.
(2) A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.

15 U.S.C. § 1666(b).  Pursuant to the First Interpretation, which is less friendly to obligors, the "reflection" being disputed by the obligor must be a reflection "of an extension of credit."  Pursuant to the Second Interpretation, the "reflection" being disputed by the obligor need only be a reflection on a statement that is itself "an extension of credit," *i.e.*, a credit card statement.  The Court is the first to explicitly address this question of construction.[16]

       In interpreting a statute, a court's "primary task is to determine congressional intent, using traditional tools of statutory construction."  *Houghton ex rel. Houghton v. Reinertson*, 382 F.3d 1162, 1170 (10th Cir. 2004) (quotations omitted).  There are several traditions tools of statutory construction relevant to this case.  First, a court must assume that Congress' intent is expressed correctly in the ordinary meaning of the words it employs.  *Id.*; *see also Ridenour v. Kaiser-Hill Co., LLC.*, 397 F.3d 925, 933 (10th Cir. 2005) ("As a general rule, statutory language is to be interpreted according to the common meaning of the terms employed. Our analysis of statutory construction must begin with the language of the statute itself, and [absent] a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.") (quotation

---

[16]    This question is not discussed in existing case law, although it may at least partially explain the split in decisions.  The *Esquibel* court implicitly adopted the First Interpretation because it required the finance charges to qualify as reflections of "extensions of credit" in order to qualify as billing errors under either § 15 U.S.C. § 1666(b)(1) or (2).  *See Esquibel*, 487 F. Supp. 2d at 828 (reasoning that the first and second definitions of billing error require that the "statement reflect 'an extension of credit' that is challenged").  The *Raney* court seems to have implicitly adopted the Second Interpretation and concluded that "of an extension of credit" merely referred to the type of statement being challenged.  *See Raney*, 2006 WL 2588105, at * 3 (reasoning that "the language of the statute requires only that a claimant allege a dispute of a billing error in connection with 'an extension of credit.' (*i.e.*, a credit card)").

omitted).  Second, a court must consider the whole act and evaluate terms in context.  *Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1039 (10th Cir. 2006).  Third, the rule against surplusage encourages courts to give meaning to every word used in a statute based on the belief that Congress would not have included superfluous language.  *Id.*  Fourth, a court must "presume legislative enactments to be reasonable and logical."  *United States v. O'Driscoll*, 761 F.2d 589, 597 (10th Cir. 1985).  Finally, TILA is a remedial statute that must be "construed liberally in favor of the consumer."  *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002).

The phrase "of an extension of credit" appears directly after "statement," which would ordinarily indicate that the phrase modifies "statement" rather than "reflection," thereby supporting the Second Interpretation.  However, if "of an extension of credit" only modifies the word "statement," the drafter's use of the word "reflection" makes little sense.  The definition begs the question – a reflection of what?  Under the Second Interpretation, the word "reflection" seems out of place.

Surrounding statutory provisions strongly support the First Interpretation.  Section 1666(a), which appears before the "billing error" definition in § 1666(b), already provides that the "statement" to which the statute refers is a "statement of the obligor's account in connection with an extension of consumer credit."  Thus, further clarification of the word "statement" would seem redundant in the list of billing errors contained in § 1666(b).  Second, two other specified billing errors within the definition employ the phrase "on a statement" without clarifying that the statement is "of an extension of credit."  *See* 15 U.S.C. § 1666(b)(4) ("[A billing error consists of] [t]he creditor's failure to reflect properly *on a statement* a payment made by the obligor or a credit issued to the obligor.") (emphasis added); 15 U.S.C. § 1666(b)(5) ("[A billing error consists of] [a]

computation error or similar error of an accounting nature of the creditor *on a statement*.") (emphasis added).  Thus, the drafters did not further modify "statement" in these subsections, nor is there any reason they would have needed to do so in § 1666(b)(1) and (2).  The language of 15 U.S.C. § 1666(b)(3) also supports the First Interpretation.  It provides:  "[A billing error consists of] [a] reflection on a statement of goods or services not accepted by the obligor . . . or not delivered to the obligor . . ."  The "statement" referred to in § 1666(b)(3) is not a "statement of goods or services."  Instead, the phrase "of goods or services" clearly modifies the word "reflection," *i.e.*, "reflection . . . of goods or services not accepted by the obligor. . ."  This is consistent with the First Interpretation, *i.e.*, "reflection . . . of an extension of credit" that was not made by the obligor or was not in the correct amount.  The other interpretation of § 1666(b)(3), which would be consistent with the Second Interpretation, would leave "reflection" with no logical modifying phrase, *i.e.*, "reflection . . . not accepted by the obligor."

It is more reasonable that Congress intended the phrase "of an extension of credit" in § 1666(b)(1) and (2) to have a specific meaning and to describe a type of error, rather than to merely redefine the type of "statements" containing such error.  Therefore, even in light of the liberal construction to be afforded the FCBA, the Court concludes that, in order to qualify as a billing error pursuant to 15 U.S.C. § 1666(b)(1) or (2), the alleged error must be a "reflection . . . of an extension of credit" appearing on the obligor's statement.  This requirement is the same whether the obligor's challenge is in the form of disputed transactions/amounts (§ 1666(b)(1)) or a request for supporting documentation (§ 1666(b)(2)).  The Court rejects the Second Interpretation, which would allow the challenged item to be anything that is disputed or anything for which the obligor requests

documentation that appears on the statement.[17]

Next, the Court turns to the question of whether finance charges qualify as "reflection[s] . . . of extension[s] of credit" for purposes of § 1666(b)(1) and (2). This Court agrees with the *Esquibel*'s court's conclusion that finance charges do not qualify as extensions of credit pursuant to 16 U.S.C. § 1666(b)(1) and (2) because they are instead merely incident to extensions of credit. *See Esquibel*, 487 F. Supp. 2d at 828-29. Pursuant to its statutory definition in TILA, a "finance charge" is "an *incident to* the extension of credit" rather than an actual "extension of credit." 15 U.S.C. § 1605(a) (emphasis added). The drafters of § 1666(a) limited the types of items that could be disputed to "billing" errors, rather than some other types of errors covered by other TILA provisions. The drafters then identified seven categories of "billing errors," two of which require the error to be a "reflection . . . of an extension of credit" that is either incorrect or in need of clarification. 15 U.S.C. § 1666(b)(1), (2). A dispute or request for further documentation regarding a "finance charge" is simply not a dispute regarding a "reflection . . . of an extension of credit" as contemplated in § 1666(b)(1) and (2). It is a dispute regarding an item that is "incident to" an extension of credit. At the time of enacting the FCBA, "finance charges" were clearly defined in the statute as something *other than* extensions of credit, and the Court therefore finds they do not meet the definitions in § 1666(b)(1) and (2).

Other provisions of § 1666 support this conclusion. For example, § 1666(a)(B)(i), addressing Compliance Duties, states that a creditor must make appropriate corrections to the

---

[17]    The court in *Burnstein v. Saks Fifth Avenue & Company*, 208 F. Supp. 2d 765, 774 (E.D. Mich. 2002), stated that "a request for clarification may itself constitute a 'billing error' that triggers the procedural framework for resolving billing disputes." This Court agrees with this conclusion only if the request is for the purpose of clarifying a "reflection . . . of an extension of credit" on a billing statement. 15 U.S.C. § 1666(b)(2).

obligor's account, "including the crediting of any finance charges on *amounts erroneously billed*." This indicates that "amounts erroneously billed" (billing errors) and finance charges are typically two different things. Further, § 1666(c) authorizes a creditor to send statements of account including disputed amounts under certain circumstances. Such statements of account "may include finance charges *on amounts in dispute*." 15 U.S.C. § 1666(c) (emphasis added). This also indicates that "amounts in dispute" are ordinarily something other than finance charges, which are merely incident to the amount in dispute.

Plaintiff argues that, notwithstanding the clear definition of "finance charge" as something other than an actual "extension of credit," a "finance charge" satisfies the general definition of "credit" set forth in 15 U.S.C. § 1602(e), which provides: "The term 'credit' means the right granted by a creditor to a debtor to defer payment of a debt or to incur debt and defer its payment." In his briefs, Plaintiff contends: "The finance charge (debt) [was] incurred on . . . Plaintiff's statement and the Defendant granted Plaintiff the right to delay payment until the date the minimum payment was due. Defendant allowed further deferment of the payment each billing cycle thereafter, while assessing additional fees and finance charges, therefore, the finance charge is an extension . . . of credit as defined by the statute." (Pl.'s Resp. to Chase's Mot. for Summ. J. 13.) Plaintiff's argument appears to be that finance charges are extensions of "credit," as defined in § 1602(e), rather than merely the cost of credit, because new finance charges are imposed on unpaid finance charges as well as merchant charges. The Court rejects Plaintiff's argument because the best indicator of whether "finance charges" are "extensions of credit" is the actual definition of "finance charges," rather than a strained reading of the general "credit" definition. The definition of "finance charges" makes clear that they are "incident to" extensions of credit and are not themselves extensions of

credit to an obligor.  Further, the Supreme Court has stated that a creditor extends "credit" for purposes of the FCBA in only two instances: (1) "when it opens or renews an account;" and (2) "when the cardholder actually uses the credit card to make purchases."  *Koerner*, 452 U.S. at 241. The imposition of finance charges on amounts purchased is not included in such definition.[18]

Therefore, based on its conclusions that (1) the phrase "of an extension of credit" modifies the word "reflection" and therefore has a specific and limiting purpose in § 1666(b)(1) and (2); and (2) finance charges are not reflections "of an extension of credit," the Court holds that allegedly erroneous finance charges do not qualify as "billing errors" pursuant to 15 U.S.C. § 1666(b)(1) or (2).[19]

b.      15 U.S.C. § 1666(b)(5)

Unlike § 1666(b)(1) and (2), § 1666(b)(5) does not require that the challenged item be a reflection "of an extension of credit" on a statement.  Instead, it merely requires that the disputed

---

[18]      The Court rejects Plaintiff's reliance on *Belmont v. Associates National Bank*, 119 F. Supp. 2d 149 (E.D.N.Y. 2000), as support for his position.  In *Belmont*, the court held a "wrong person" error qualified as a "billing error" pursuant to § 1666(b)(1) and (2).  In that case, a father drafted a notice stating that the inclusion of his name on his son's credit card bill was in error because he was not an obligor on the account and never borrowed on the account.  The court held that such error (1) qualified as a "billing error" pursuant to § 1666(b)(1) because "[n]othing in paragraph (1) indicates that its scope is limited to particular charges to the account, as opposed to the entire account itself," and (2) qualified as a "billing error" pursuant to § 1666(b)(2) because the father "requested . . . clarification . . . regarding whether [the defendant] had, in fact, extended him the credit reflected on the May 5, 1998 statement."  *Id.* at 159.  In this case, Plaintiff has not disputed or requested clarification regarding whether his creditors extended him credit, either initially or on a particular occasion.  He disputed and requested clarification regarding an item that was merely incident to the extension of credit.

[19]      If and to the extent Plaintiff alleges that other fees or interest charges are "billing errors," the Court rejects such argument because interest charges and fees are properly viewed as penalties rather than extensions of credit.  *See Esquibel*, 487 F. Supp. 2d at 829 ("In reality, both over-the-limit fees and late fees are penalties, not extensions of credit. . . . The assessment of a penalty for exceeding the authorized credit limit or for failing to make a timely payment is not a purchase to which the right to defer payment attaches.").

item be "a computation error or similar error of an accounting nature of the creditor on a statement." Thus, in this type of challenge, an obligor is not disputing an extension of credit, the amount of a particular extension of credit, or requesting supporting documentation regarding an extension of credit; he is disputing the creditor's computation or calculations of amounts owed.  In the Notices, Plaintiff makes a strained attempt to couch his dispute as one relating to the creditors' "computations."  (*See* Ex. I to Chase's Mot. for Summ. J. ("I do not believe I should be responsible for interest, finance charges, and other fees.  As I have made payments on this account that have been applied to these improper charges the items I am claim are billing errors are improperly reflected on the statements in the incorrect amount and/or inaccurate due to a computational or accounting errror.").)  Similarly, in his briefs, Plaintiff contends that the minimum payment and total amount due were miscalculated because their "computation" included the disputed finance charges from the time the account was opened.  (Pl.'s Resp. to Chase's Mot. for Summ. J. 15.)

The court in *Esquibel* rejected this argument in relation to a notice that is identical to Plaintiff's Notices.  The court reasoned:

> Plaintiff's third alleged billing error of the computational variety is wholly meritless. Plaintiff claimed that, because amounts she was disputing had been added to the total amount owed and the amount due had been calculated from that total, the entire balance was in dispute. Having identified no computation error or accounting error, Plaintiff's assertion did not qualify as a billing error. Allowing Plaintiff's argument would suggest that every challenge, even ones that do not qualify as billing errors (as here), could be transformed into a billing error because the challenged amount was added into the account total from which the minimum payment was calculated. In every case, the challenged amount would bring the entire balance into dispute. This is obviously not the intention, as the statute and regulations separately address the creditor's rights and obligations for disputed and undisputed amounts. *See* 15 U.S.C. § 1666(c) ("Nothing in this section shall be construed to prohibit any action by a creditor to collect any amount which has not been indicated by the obligor to contain a billing error."); 12 C.F.R. pt. 226, supp. I, official staff commentary, § 226.13, ¶ 13(d)(2) ("Although the creditor must not issue an adverse credit report because the consumer fails to pay the disputed amount or any related charges, . . . the creditor

may report the account as delinquent if undisputed amounts remain unpaid.").

*Esquibel*, 487 F. Supp. 2d at 829.  Again, the Court finds the *Esquibel* court's reasoning persuasive. It is clear that Plaintiff was not alleging the type of computation or accounting error that was contemplated by Congress when it enacted § 1666(b)(5); instead, Plaintiff was disputing whether finance charges were *ever* properly imposed in light of the creditors' alleged failures to provide proper disclosures.  It must be remembered that the dispute process set up by § 1666(a) forces a creditor to timely and adequately respond to a computational error identified by the obligor.  This necessarily contemplates that a creditor has made a specific computational or accounting mistake on a particular statement, not a global mistake that will infinitely impact the current balance owed and therefore result in a never-ending "computation" error.  Further, it is nearly impossible for a creditor to undo the allegedly "incorrect" finance charges imposed for the life of the account and respond appropriately within the required time frame.  Although it seems there could be an instance involving a true "accounting error" in connection with a "finance charge," such as the creditor utilizing an incorrect rate or miscalculating the interest as applied to a specific charge, that is simply not what the Notices in this case allege; instead, they allege that the finance charges should never have been imposed at all.  Accordingly, the alleged erroneous finance charges in the Notices before the Court do not qualify as "billing errors" pursuant to 16 U.S.C. § 1666(b)(5).

In sum, the Court holds that the Notices do not satisfy the Content Requirement because they do not identify a perceived "billing error" as defined by § 1666(b)(1),(2), or (5).  To the extent managers of DRSM believed that the letters provided to Plaintiff were sufficient to trigger creditor's

Compliance Duties and therefore lead to TILA violations, this Court expressly holds otherwise.[20]

      D.      Content Requirement - Good Faith

Even if the Notices satisfy the "billing error" aspect of the Content Requirement, Chase argues that Plaintiff's Notices are also invalid because they were submitted in bad faith.  (*See* Chase's Mot. for Summ. J. 24 ("Plaintiff [was] submitting these letters in an attempt to avoid paying his debt pursuant to the DRSM/CFE scam concocted by Coccia and Collette. . . . [and] [t]his scam is not based on any evidence that Chase acted improperly and is simply based on the unsubstantiated belief that all banks typically violate the disclosure rules and the TILA.").  As pointed out by Chase, this is not a typical case in which an obligor identified a specific problem with his account and drafted a notice of billing error for submission to the creditor.  *See, e.g.*, *Burnstein*, 208 F. Supp. 2d at 768 (obligor drafted letter to creditor regarding problem of "double billing" related to use of her maiden name on a certain account).  Instead, Plaintiff purchased the Program and utilized DRSM form letters drafted by someone else to raise the "dispute" with his creditors.  Use of a form letter makes it less likely that a plaintiff has a genuine dispute with his bill and more likely that a plaintiff was attempting to rack up TILA violations to ultimately eliminate his debt.  Nonetheless, the Court must strictly comply with the statute and, unless the statute has a good-faith component, Plaintiff's motives for sending the Notices are irrelevant.

In the Court's view, there is nothing in the plain language of the statute or regulations that

---

[20]    Although the FCBA must be interpreted liberally in favor of consumers, this is not an overly harsh result for consumers.  There is a specific TILA provision governing required disclosures.  *See* 15 U.S.C. § 1637.  Obligors may sue creditors who fail to make such disclosures and recover, *inter alia*, "twice the amount of any finance charge in connection with the transaction."  *Id.* § 1640.   In this case, Plaintiff tried to force allegedly erroneously imposed finance charges resulting from disclosure violations into the definition of  "billing error;" however, such an error simply does not satisfy the statutory definition in § 1666(b).

impose a good-faith requirement on the obligor.  *See* 15 U.S.C. § 1666(a)(2) (stating that a plaintiff must indicate a "belief" of a perceived billing error but not specifying whether plaintiff must have a good-faith motive to resolve dispute or a bad-faith motive to trigger TILA violations); 12 C.F.R. § 226.13 n.27 & 12 C.F.R. pt. 226, supp. I, official staff commentary, § 226.13 (mentioning "good faith" of consumer in relation to creditor's acceleration rights but not in manner that absolves creditors of its initial Compliance Duties).  In addition, the weight of authority holds that there is no good-faith requirement in the FCBA.  *See Esquibel v. Chase Manhattan Bank USA, N.A.*, 487 F. Supp. 2d 818, 827 (S.D. Tex. 2007) ("The bottom line is that the court is unwilling to read a subjective, good-faith requirement into an objective statutory scheme."); *Kurz v. Chase Manhattan Bank*, 273 F. Supp. 2d 474, 478 (S.D.N.Y. 2003) ("TILA does not explicitly require that the obligor's complaint arise out of a good faith belief that he does not owe the amount specified."); *Raney v. First Nat'l Bank of Nebraska, Inc.*, No. 06-8-DLB, 2006 WL 2588105, at *3 (E.D. Ky. Sept. 8, 2006) ("Plaintiffs' beliefs as to why the billing error occurred is not dispositive to their FCBA claim.").  *But see Eicken v. USAA Fed. Sav. Bank*, 498 F. Supp. 2d 954, 965-66 (S.D. Tex. 2007) (rejecting above cases and holding that "belief" in § 1666(b)(2) necessarily contemplates a good-faith belief).  Accordingly, the Court concludes there is no good-faith requirement in the FCBA.[21]

---

[21]     Even if the Court were to impose such a requirement, the facts of this case are distinguishable from those presented in *Eicken*.  The plaintiff in *Eicken* admitted he had "no previous notion" that his creditors had committed disclosure violations prior to purchasing the Program.  *See Eicken*, 498 F. Supp. 2d at 965-66 (holding that a plaintiff who admitted that he "had no previous notion or thought about disclosures" until he came across the DRS scheme had not created a question of fact as to whether he actually "believed" his statements contained errors).  Plaintiff maintains that he believed he did not receive proper disclosures even prior to finding the Program.  (Langenfeld Dep. 207:11-20; *see also* Pl.'s Resp. to Chase's Mot. for Summ. J. Fact No. 31.)

E.      Timeliness Requirement

Chase and Citibank also raised, in the alternative, the Timeliness Requirement.  Under the FCBA, a creditor is obligated to respond to a notice of billing error only if it is received within sixty days after the creditor transmitted the account statement that contained the error.  15 U.S.C. § 1666(a); *Eicken v. USAA Fed. Sav. Bank*, 498 F. Supp. 2d 954, 962 (S.D. Tex. 2007). The FCBA's implementing regulation, known as Regulation Z, specifies that, in order to qualify as a billing error notice pursuant to 15 U.S.C. § 1666(a), the notice must be "received by a creditor . . . no later than 60 days after the creditor transmitted the *first periodic statement* that reflects the alleged billing error."  12 C.F.R. § 226.13(b)(1).  Therefore, the obligor's sixty-day clock begins to run upon the creditor's transmission of the first statement containing the alleged billing error.

As explained above, the Court construes the alleged "billing error" as erroneous finance charges.[22]  Thus, the question is whether the First Notices were received by Chase within sixty days of transmission of the first statements containing the allegedly erroneous finance charges.  Chase contends the First Notices were not timely because Plaintiff had incurred finance charges, and received statements reflecting such finance charges, years before he sent the First Notices in January of 2005.  Plaintiff does not dispute this.  Instead, Plaintiff contends that the First Notices only dispute or request clarification for the finance charges as reflected on the most recent statements.  (*See* Pl.'s Resp. to Chase's Mot. for Summ. J. 20 ("In this case, Plaintiff requested clarification and

---

[22]   Citibank's timeliness argument assumes the "dislcosure violations" are the billing errors; therefore, Citibank did not provide evidence regarding the first imposition of a finance charge.  (*See* Citibank's Mot. for Summ. J. 18.)  Accordingly, the Court's holding regarding the Timeliness Requirement applies only to Chase.

documentary evidence of an amount, the monthly finance charge, for the most recent month(s) only.").

All courts that have addressed this question have held that notices identical to Plaintiff's do not satisfy the Timeliness Requirement, albeit for slightly different reasons.  *See Eicken*, 498 F. Supp. 2d at 962-65; *Cunningham v. Bank One*, 487 F. Supp. 2d 1189, 1193 (W.D. Wash. 2007); *Washington Mutual Bank v. Forgue*, No. 07-MC-6027, 2007 WL 4232708, at * 1 (W.D.N.Y. 2007); *Discover Bank v. Beckerman*, No. 2006-1921, 2008 WL 141677, at * 1 (N.Y. App. Term Jan. 11, 2008).  This Court reaches the same conclusion, for similar reasons as set forth by the court in *Eicken*.  Plaintiff's Notices clearly disputed finance charges other than those on the most recent statements.  The Notices challenged all finance charges imposed since the inception of the account and requested Chase to unravel this "error" beginning with the first finance charge ever imposed. (*See* Ex. I to Chase's Mot. for Summ. J. (alleging that Plaintiff "should not have been charged finance charges or fees for the history of this account" and that account could not "legally be opened" based on disclosure violations occurring prior to opening of the account).)  Thus, the "first periodic statement" containing finance charges that were allegedly erroneous due to disclosure violations was the first statement containing any finance charges at all.  *See Eicken*, 498 F. Supp. 2d at 963 (same conclusion).

With respect to the 92 Chase Account, the records available to Chase show that finance charges were imposed at least as early as February 24, 2000.  As to the 98 Chase Account, the records available to Chase show that finance charges were imposed at least as early as August 6, 1999.  Thus, the First Notices – sent in January 2005 – were over four years late.  This is true regardless of whether the "billing error" is construed as one arising pursuant to § 1666(b)(1), (2),

29

or (5).  Under any of these three definitions, the "errors" about which Plaintiff was complaining or requesting clarification (assuming they qualified as billing errors) appeared for the first time well outside the sixty-day window.  *See Eicken*, 498 F. Supp. 2d at 964-65.  Accordingly, the Court holds that, with respect to Defendant Chase, Plaintiff's Notices also fail to satisfy the Timeliness Requirement.

      F.    <u>Statute of Limitations</u>

Creditor Defendants argue that Plaintiff's TILA claims are barred by the one-year Statute of Limitations in 16 U.S.C. § 1640(e).  They do so, however, based on the premise that the alleged TILA violations are "disclosure violations," which necessarily occurred upon the opening of the accounts.  (*See* FIA's Mot. for Summ. J. 18-19; Citibank's Mot. for Summ. J. 19-20 ("Because Plaintiff's alleged claim of violation is based on the Banks' failures to make the proper initial disclosures, then, by definition, the alleged violations occurred at the time the account[s] were opened, in 2000 and 20003 [sic] respectively."); Chase's Mot. for Summ. J. 28.)  This premise is incorrect.  The alleged violations in this case are FCBA violations, which occur on the date a creditor "fails to comply with the statutory scheme for resolving billing disputes."  *Burnstein*, 208 F. Supp. 2d at 776 n.18.  The FCBA's protections are procedural rather than substantive, meaning the FCBA "violation" occurs upon the creditor's failure to satisfy its Compliance Duties within the requisite time frame, and "not when, for example, the creditor commits a billing error that triggers the dispute resolution process."  *Id.*  For the reasons explained above, the Court concludes that Plaintiff never triggered any Compliance Duties, that no violations occurred, and that the statute of limitations was never tolled.  *See Dawkins*, 109 F.3d at 243 (same result).  Therefore, Plaintiff's

claims are not barred by the Statute of Limitations.[23]

### III.   Creditor Defendants' Motions for Summary Judgment on OUCC Claims

Plaintiff's Complaint alleges violations of Title 14A, Sections 2-310 and 2-310.1 of the Oklahoma Statutes.  (Second Am. Compl. ¶¶ 49-53.)  These two provisions set forth the disclosures that must be provided upon the opening of revolving charge account plans, Okla. Stat. tit. 14A, § 2-310, and the disclosures that must be provided in applications and solicitations for such accounts, *id.* § 2-310.1.  Thus, unlike Plaintiff's federal claims which are based solely on procedural failures under the FCBA, Plaintiff's state claims are based on Creditor Defendants' failures to provide the requisite disclosures under Oklahoma law.

The Court finds that Plaintiff's state law claims are barred by the relevant statute of limitations, which provides that claims for violations must be brought within one year of the violation.  *Id.* § 5-203(6).  Violations for § 2-310 arise if the required disclosures are not made "before the first transaction is made."  Okla. Admin. Code § 160:45-3-1(b)(1).  Violations for § 2-310.1 arise if the required disclosures are not made "on or with a solicitation or an application to open a credit or charge card account."  *Id.* § 160:45-3-2(a).  It is undisputed that all of Plaintiff's accounts were opened on or before 2003.  This is more than one year prior to the date Plaintiff filed suit - September 27, 2005.  Accordingly, Plaintiff's state law claims are time barred.[24]

---

[23]      The Court notes that, had Plaintiff's First Notices satisfied the Content Requirement and Timeliness Requirement, his claims would not have been barred by the Statute of Limitations.  His lawsuit was filed on September 27, 2005, which is within one year of the time Creditor Defendants' Compliance Duties would have been triggered by the Notices, which were sent in January and February of 2005.  *See Burnstein*, 208 F. Supp. 2d at 776 (explaining when statute begins to run as to § 1666(a) violation).

[24]      If and to the extent Plaintiff's claims arising under the OUCC are based on Creditor Defendants' failures to respond to his Notices, such claims are not recognized by the OUCC.  *See* Okla. Admin. Code § 160:45-1-1(a) ("Oklahoma does not have a Fair Credit Billing Act;

IV.     **Hanna's Motion for Summary Judgment**

Plaintiff alleges that Defendant Hanna violated the FCBA and OUCC when it attempted to collect debt on behalf of Bank of America even though such debt was disputed.  (Second Am. Compl. ¶ 20-21.)[25]  It is undisputed that Hanna, a law firm, does not itself meet the definition of "creditor" in TILA.  *See* 15 U.S.C. § 1602(f).  However, Plaintiff contends Hanna qualifies as a "creditor" because it was an "agent" of Bank of America pursuant to 15 U.S.C. § 1602(n), which provides that "[t]he term 'card issuer' means any person who issues a credit card, or the agent of such person with respect to such card."  *See also Neff v. Capital Acquisitions & Mgmt. Co.*, 352 F.3d 1118, 1120 (7th Cir. 2003) (addressing argument that an entity other than card issuer was liable for TILA violations as a "creditor" because it was an "agent" of the card issuer).  The Court rejects this agency argument.  The Official Staff Commentary to the TILA regulations explains that to become an "agent" of a card issuer, there must be an agreement that "the cardholder may use a line of credit with the [alleged agent] to pay obligations incurred by use of the credit card."  *See* 12 C.F.R., pt. 226, supp. I, official staff commentary, ¶ 2(a)(7).  In this case, Hanna did not enter into any type of contractual relationship with Bank of America, and Plaintiff had no independent credit privileges with Hanna.  *See Neff*, 352 F.3d at 1120 (citing above regulation) (holding that entities to which original card issuer sold account were not "agents" of card issuers because they did not have contractual relationships with card issuers but instead merely purchased the plaintiff's accounts from

_____

thus, creditors in Oklahoma should recognize that regulation of fair credit billing requirements lies with federal authorities.").

[25]     In Plaintiff's response, he alleges that Hanna violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA").  However, such claim was not sufficiently alleged in the Complaint.  There is no verbiage in the Complaint related to violation of the FDCPA.  Further, the Complaint contains only one "claim for relief" arising under the OUCC and the FCBA.

card issuers).

Plaintiff also seeks to hold Hanna liable pursuant to an "assignee liability" provision in TILA, 15 U.S.C. § 1641.  For the reasons explained above, the Court has found no violations by Bank of America.  It follows that there can be no "assignee" liability imposed upon Hanna based on its efforts to collect Plaintiff's debt owed to Bank of America.  Even assuming Bank of America committed an FCBA violation, Hanna could not be held liable under TILA's "assignee liability" section, which provides:

> Except as otherwise specifically provided in this subchapter, any civil action for a violation of this subchapter or proceeding under section 1607 of this title which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought *is apparent on the face of the disclosure statement*, except where the assignment was involuntary.

15 U.S.C. § 1641 (emphasis added).  First, there is no evidence that Bank of America assigned or in any way sold Plaintiff's account to Hanna.  Instead, they merely hired Hanna as an independent contractor to collect Plaintiff's debt.  Second, the allegations in this case are that Bank of America failed to satisfy its FCBA Compliance Duties upon receipt of Plaintiff's Notice.  This is not a TILA "violation" that can be passed on to an assignee because it is not a violation "apparent on the face of the disclosure statement."  Plaintiff's alleged errors in his Notices – erroneous finance charges – were not based on violations appearing on the face of his disclosure statements; Plaintiff alleged to have never received *any* disclosure statements.  Accordingly, even if Bank of America had committed a violation and then assigned Plaintiff's account to Hanna, Hanna would still not be subject to assignee liability.  *See Mayfield v. Gen. Elec. Co.*, No. 97-CIV-2786, 1999 WL 182586, at * 3 (March 31, 1999) (holding there was not assignee liability because Plaintiff did not allege any violations that appeared on the face of the disclosure statement).

33

## V.     Chase's Motion for Summary Judgment on its Counterclaim

Chase has presented evidence that: (1) the 92 Chase Account has a past due balance of $12,901.23, plus accrued prejudgment interest since August 31, 2005; and (2) the 98 Chase Account a past due balance of $9,908.79, plus accrued prejudgment interest since September 30, 2005.  (*See* Quirk Aff., Ex. B to Chase's Mot. for Summ. J., at ¶¶ 7-8.)  Plaintiff does not dispute the balances on these accounts and agrees that he liable for the total amount of the balance if his claims against Chase fail.  (Langenfeld Dep. 202-03.)    Accordingly, Chase is entitled to judgment on its counterclaim for these amounts due and owing on the 92 Chase Account and the 98 Chase Account.

## VI.     Conclusion

It is hereby ORDERED that Defendant Frederick J. Hanna & Associates, Inc.'s Motion for Summary Judgment (Doc. 219) is GRANTED; Defendants MBNA America Bank, N.A. and Bank of America, N.A.'s Motion for Summary Judgment (Doc. 222) is GRANTED; Defendant Citibank (South Dakota), N.A.'s Motion for Summary Judgment (Doc. 221) is GRANTED; and Defendant Chase Bank USA, N.A.'s Motion for Summary Judgment (Doc. 220) is GRANTED as to Plaintiff's claims and GRANTED as to its counterclaim against Plaintiff.   MBNA and Bank of America's Motion to Strike Plaintiff's Surreply (Doc. 268) is DENIED; Plaintiff's Motion to Overrule Motion to Strike (Doc. 269) is GRANTED; and Plaintiff's Motion for Hearing (Doc. 271) is DENIED as moot.

The only remaining claim is Bank of America's counterclaim, which is stayed pending the outcome of the Bankruptcy Proceeding.  Bank of America, by and through FIA, is ordered to submit a report within ten days of this Order regarding the status of its claim in the Bankruptcy Proceeding or a stipulated dismissal of such claim.

ORDERED this 5th day of March, 2008.

TERENCE KERN
UNITED STATES DISTRICT JUDGE